# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

MELVIN McKINNEY,        )
                          )
     **Plaintiff,**        )
                          )
     **vs.**             )    **Case number 4:12cv0546 TCM**
                          )
**CAROLYN W. COLVIN, Acting**   )
**Commissioner of Social Security,[1]** )
                          )
     **Defendant.**      )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Melvin McKinney (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned for review and final disposition pursuant to the parties' written consent. See 28 U.S.C. § 636(b).

### Procedural History

Plaintiff applied for DIB and SSI in November 2009, alleging he had become disabled on September 1, 2006, by hepatitis C. (R.[2] at 98-107.) His applications were denied initially

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security in February 2013 and is hereby substituted for Michael J. Astrue as defendant. See 42 U.S.C. § 405(g).

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

and following a hearing held in October 2010 before Administrative Law Judge (ALJ) Randolph E. Schum.  (Id. at 9-26, 31-57.)  The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Delores E. Gonzalez, M.Ed., V.R.C (Vocational Rehabilitation Counselor), testified at the administrative hearing.

Plaintiff testified that he was then forty-four years old and had completed the eighth grade.  (Id. at 33.)  He had never tried to get a General Equivalency Degree (GED).  (Id. at 34.)

From 1996 to 2001, Plaintiff worked for Gate Gourmet delivering airline food.  (Id.)  He worked as a casual mail clerk and mail handler for the Post Office from 2003 to 2006.  (Id. at 34-35, 43.)  He was fired from that job for missing too many days of work and using the restroom too frequently.  (Id. at 35.)  In 2007, he worked for the Salvation Army driving bell-ringers.  (Id.)  He worked for a company in Wyoming driving railroad workers from December 2007 to February 2008  and for a company in Iowa from March 2009 to June 2009.  (Id. at 36.)

Plaintiff explained that a reference in the medical notes to him playing basketball two or three times a week was to what he used to do; he was not currently playing the sport.  (Id.)  He stopped playing basketball in approximately 2006 and was diagnosed in 2007 with hepatitis C.  (Id. at 36-37.)

- 2 -

Plaintiff does not receive any treatment for his hepatitis C; rather, he is monitored for it every six months.  (Id. at 37.)  He does not have to take medication for it, and speculates that is because he cannot afford medication.[3]  (Id.)

Asked how his hepatitis C prevents him from working, Plaintiff explained that he "get[s] sick too much" because liver damage has weakened his immune system.  (Id.)  When he gets sick, he goes to the emergency room.  (Id. at 38.)

Also affecting his ability to work is the arthritis in his neck, causing pain to shoot up the neck.  (Id.)  His left knee occasionally gives out on him.  (Id. at 40.)

Plaintiff is to be scheduled to see a psychologist for his depression.  (Id. at 39.)  He does not want to be around people and stays in his house.  (Id.)  He recently tried to choke and hit his nephew.  (Id. at 39-40.)

Plaintiff tries not to drive because one of his medications, Alprazolam, makes him drowsy.  (Id. at 41.)  He tries to do household chores.  (Id. at 41-42.)  He has not taken a shower since getting out of the hospital the last month.  (Id. at 42.)  They do not have any hot water, and he can not stand cold water.  (Id.)

Ms. Gonzalez testified without objection as a vocational expert (VE).  She was asked by the ALJ to assume a hypothetical claimant of age forty at the alleged date of onset and with an eighth-grade education.  (Id. at 44.)  This person could perform at least the full range of light work with the exception that he have no direct contact with food.  (Id.)  Asked if this

---

[3]A Report of Contact dated December 15, 2009, notes that Plaintiff was approved for Medicaid.  (Id. at 157-58.)

person could return to any of Plaintiff's past relevant work, Ms. Gonzalez replied that he could return to the mail clerk position, *Dictionary of Occupational* Titles (DOT) 209.687-026, which was light, unskilled work, or to the mail handler position, DOT 209.687-014, which was light, semi-skilled.  (Id. at 44-45.)  This latter position would be medium as Plaintiff performed it and as it is generally performed in the national economy.  (Id. at 45.)

Ms. Gonzalez stated that her testimony is consistent with the DOT, with the exception of the lifting requirements of the mail handler position.  (Id.)  She had observed how this position is actually performed, and it is performed at the medium exertional level.  (Id.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, school records, and records from health care providers.

When applying for DIB and SSI,[4] Plaintiff completed a Disability Report.  (Id. at 146-54.)  He is 6 feet 2 inches tall and weighs 160 pounds.  (Id. at 146.)  Hepatitis C limits his ability to work by causing him to tire easily and use the restroom frequently.  (Id. at 147.)  Also, his stomach occasionally hurts.  (Id.)  His impairments first interfered with his ability to work on September 1, 2006, and prevented him from working the same day.  (Id.)  He stopped working, however, on June 9, 2009, because of his disabilities.  (Id.)  He completed the ninth grade, and had not attended special education classes.  (Id. at 152.)

---

[4]These were Plaintiff's fourth DIB and SSI applications.  (See id. at 142-43.)  Previous applications had been denied in 1994 at the initial level and not pursued further; in 1995 after a hearing; and in 2002 at the initial level.  (Id.)

On a Function Report, Plaintiff described what he does during the day.[5]  (Id. at 159-66.)  He gets up, eats, works around the house, alternates between sleeping and watching television, and, if necessary, tries to catch a ride to an appointment if he has one.  (Id. at 159.)  He lives in a house with his family.  (Id.)  He cares for his two children, making sure they are fed, clothed, and attend school.  (Id. at 160.)  His illness makes him use the restroom frequently, which also interferes with his sleep.  (Id.)  He needs to be reminded to do things.  (Id. at 161.)  He prepares easy, quick meals which take only five to ten minutes.  (Id.)  His household chores include cleaning, doing laundry, sweeping, mopping, washing dishes, and shoveling snow.  (Id.)  How long these chores take depends on the task.  (Id.)  He sometimes does not finish them.  (Id.)  He goes outside only when necessary.  (Id. at 162.)  He can drive a car, and shops in stores or on the computer for groceries and clothing.  (Id.)  He can count change, use a checkbook, pay bills, and handle a savings account.  (Id.)  His hobbies include watching television and playing basketball, although he no longer does the latter.  (Id. at 163.)  He does not go out on a regular basis, and does not like to be bothered by people.  (Id. at 163-64.)  His impairments adversely affect his abilities to lift, squat, bend, sit, kneel, hear, climb stairs, see, remember, concentrate, complete tasks, understand and get along with others.  (Id. at 164.)  He does not know how far he can walk before having to stop and rest.  (Id.)  He can pay attention for less than five minutes.  (Id.)  Depending on what is being said, he can follow spoken instructions.  (Id.)  With written instructions, he usually looks at the pictures rather

---

[5]The form was completed in the first person; however, "Garrett Mitchell" was named as the person completing the form.  There is no indication of who this person is or of his relationship to Plaintiff.

than read the instructions.  (Id.)  He gets along "okay" with authority figures.  (Id. at 165.)
Stress and changes in routine bother him.  (Id.)

On a Work History Report, Plaintiff listed three jobs, two were as a driver and one
was as a mail handler.  (Id. at 170-77.)  The mail handler job required that he fill out labels,
move tubs of sorted mail to the correct location, and maintain the machines that sort the
mail.  (Id. at 173.)  Each day, he walked for ten hours and, for thirty minutes each, stooped;
handled, grabbed, or grasped big objects; and wrote, typed, or handled small objects.  (Id.)
The heaviest weight he lifted was approximately thirty pounds; this was also the weight he
frequently lifted.  (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his
applications.  (Id. at 181-34.)  The impairment listed on his seminal report had not changed;
however, he now had a nervous condition for which he was taking medication.  (Id. at 181.)
He takes Alprazolam for the condition.  (Id. at 183.)  It makes him drowsy.  (Id.)  As of
approximately June 15, 2009, his depression, anxiety, and pain are all worse.  (Id. at 229.)

School records for Plaintiff indicate he attended nine schools.  (Id. at 189-92.)  In three
school years, during which Plaintiff changed schools once, his grades were primarily "Fs."
(Id. at 192.)  A letter from his attorney indicates that those records, the submitted copies of
which are generally illegible, include the results of an intelligence quotient (IQ) test, the
Wechsler Intelligence Scale for Children, Revised.  (Id. at 193.)  Those results are a verbal
IQ of 69, a performance IQ of 96, and a full scale IQ of 85.  (Id.)  According to the year of
the test listed in the letter, Plaintiff would have taken it when he was nine years old.  (Id.)

- 6 -

One record indicates an IQ score of 75 in January 1978 and of 104 in 1979. (Id. at 189.) It does not define the scores in terms of whether they are verbal, performance, or full scale IQ scores.

Plaintiff had reported annual earnings from 1984 to 2007, inclusive, and 2009. (Id. at 130-31.) Those earnings exceed $10,000 in 10 years: 1991, 1996 though 2001, and 2004 through 2006. (Id.) In the fifteen years before he filed his application, he earned less than $1,000 in four years and less than $2,000 in one year. (Id. at 131.)

After his alleged disability onset date of September 1, 2006, Plaintiff worked twenty-hours a week for the Salvation Army from November 2007 to December 2007 and for Tara Transportation from December 2008 to February 2009. (Id. at 134.) He stopped working for the Salvation Army because of his medical condition and because it was seasonal work. (Id.) He stopped working for Tara Transportation because of his medical condition and because his hours were reduced from forty hours a week to twenty, at most. (Id.)

The relevant medical records[6] are summarized below in chronological order.

Plaintiff was diagnosed on September 13, 2007, with hepatitis C. (Id. at 208-19, 238-41.) Eleven days later, he consulted Laurain Hendricks, M.D. (Id. at 235-37.) She noted that he had good exercise habits, i.e., he was playing basketball two to three times a week. (Id. at 235.) He had no genitourinary, endocrine, neurological, musculoskeletal, or psychological symptoms. (Id. at 236.) He was well-developed, well-nourished, and in no

_____

[6]Included in the administrative record, but not discussed are emergency room records relating to treatments for rashes, flu symptoms, and cold symptoms. (Id. at 253-77, 281-89, 296-311.)

acute distress.  (Id.)  He had a normal gait and station.  (Id.)  He was to take Bactrim (an antibiotic) for his complaint of hematuria (blood in his urine) and return in one month for liver function tests and a physical.  (Id.)

One month later, his hematuria had cleared up on the antibiotics.  (Id. at 233-34, 247-48.)  His functional status was described as "[n]o physical disability and activities of daily living were normal."  (Id. at 233.)  He continued to have good exercise habits.  (Id.)  His abdomen was normal.  (Id. at 234.)  He was to, and did, have a hepatic function panel work-up.  (Id. at 234, 247-48.)

In November, Dr. Hendricks noted that Plaintiff had normal liver function tests.  (Id. at 232.)  He was to drink no alcohol and return in six months.  (Id.)  It was recommended that he restrict his use of Tylenol to a minimal amount.  (Id.)  He was not taking any medications.  (Id.)

Plaintiff saw Dr. Hendricks again in January 2008, but for complaints of chest congestion.  (Id. at 229-31.)  He had had the stomach flu for several days, and had a fever, sore throat, chest pain or discomfort, and a cough.  (Id. at 229.)  Examination results, including those of his abdomen, were normal.  (Id. at 230-31.)  Plaintiff was diagnosed with acute pharyngitis and prescribed medications for his sore throat and cough.  (Id. at 231.)

Plaintiff saw Dr. Hendricks for his hepatitis C again in April.  (Id. at 226-28, 242-44, 246.)  He was "[n]ot feeling tired or poorly."  (Id. at 226.)  He was not taking any medications.  (Id.)  As at the January visit, his functional status and good exercise habits were described as before.  (Id. at 226, 229.)  His examination findings, including his gait, stance,

and balance, were normal.  (Id. at 227-28.)  A hepatitic function panel was done.  (Id. at 228, 242-44, 246.)

In July, Plaintiff had a hepatitis checkup with Dr. Hendricks.  (Id. at 224-25, 245.) Her findings were as before.  (Id. at 224-25.)

With the exception of medical records unrelated to Plaintiff's relevant complaints, see note 6, supra, there are no medical records from 2009.

On March 15, 2010, Plaintiff consulted Sara Martinez, M.D., at the Wohl Medical Clinic at Barnes Jewish Hospital (Wohl Clinic), to establish care with a primary care provider.  (Id. at 345-59.)  He reported that he had at least a twenty-year history of abdominal pain that was currently a five on a ten-point scale.  (Id. at 349, 350.)  The pain was occasional and dull.  (Id. at 350.)  Plaintiff was described as either being a poor historian or having "truly vague" symptoms.  (Id. at 353.)  He did not seem to be mentally retarded.  (Id.)  On examination, his abdomen was not tender; there was no hepatosplenomegaly.[7]  (Id. at 353.) He was to have surgery on his hernia, but the doctor became sick and he was left lying on the table.  (Id. at 352.)  He did not work and, because of his abdominal pain, was applying for SSI.  (Id.)  Also, he had an "extensive psychiatric history."  (Id.)  He did not have a list of his current medications.  (Id. at 349.)  He had been seeing a Dr. O'Haven, who had referred him to the Wohl Clinic.  (Id. at 352.)  He further reported that he did not have difficulty walking or with activities of daily living, including cleaning, cooking, shopping, and driving.  (Id. at

---

[7]Hepatosplenomegaly is "[d]isease of the liver and spleen."  Stedman's Medical Dictionary, 787 (26th ed. 1995).

350.)  He had no concerns about getting medications or about housing.  (Id.)  Plaintiff was to have several tests done, including a blood panel work-up and a chest x-ray, and return in two weeks with his records.  (Id. at 353.)  The tests and x-ray were normal.  (Id. at 355-59.)

Plaintiff returned on March 31.  (Id. at 332-44.)  He had right shoulder pain that was a three on a scale of ten and had diffuse abdominal pain. (Id. at 336, 337.)  Plaintiff explained that he had a hernia on both his right and left sides.  (Id. at 337.)   He was to have surgery on it twenty years earlier, but he surgery was cancelled when he was on the operating table because the surgeon had to leave for an emergency.  (Id.)  He also had testicular and lower abdominal pain with sexual activity.  (Id.)  He tired more quickly than usual.  (Id.)  He could climb three flights of stairs, but could not play basketball like he used to do.  (Id.)  On examination, he was tender in his lower abdomen.  (Id. at 338.)  He was to have a hepatitis panel and a urinary analysis.  (Id. at 339.)  Both were negative.  (Id. at 340-43.)  A computed tomography (CT) scan of his abdomen was not needed because he had no distension or hepatosplenomegaly.  (Id. at 339.)  He was to follow-up in three months or as needed.  (Id. at 339.)

Plaintiff saw Dr. Martinez again in June.  (Id. at 322-31.)  He reported that he had been having abdominal pain for twenty years; the pain was not associated with eating.  (Id. at 327.)  He had urinary incontinence approximately once a month.  (Id.)  Plaintiff was reported to be "extremely tangential with describing his medical history, bringing up medical appointments and results from various doctor and hospital visits for the last 20-25 years. Difficult to direct with vague complaints described as 'off and on' and 'once in a blue moon'

often for every complaint." (Id.)  At the end of the visit, Plaintiff expressed "borderline homicidal ideation." (Id.)  He was upset with several family members, but "ha[d] not had a direct physical fight in many months, and [did] not have a plan." (Id.)  He lived with his father. (Id.)  On further questioning, Plaintiff explained that he did not want to harm his family, but felt overwhelmed. (Id. at 329.)  A workup for hepatitis was negative; abdominal x-rays were normal. (Id. at 328.)  On examination, he "ha[d] vague symptoms and no localizing pain." (Id.)  He was started on citalopram for his depression. (Id.)  He was referred to a social worker for a consultation about his living situation, and was to return in one month. (Id. at 325, 329.)

In August, Plaintiff saw Benjamin Voss, M.D., at the Wohl Clinic in August for a check-up of his acute sinusitis and to have disability forms completed. (Id. at 312-21.)  He was noted to have a history of depression and to have been hospitalized for suicide attempts. (Id. at 317.)  He had had chronic abdominal pain for twenty years and a history of urinary incontinence. (Id.)  He rated his current abdominal pain as a five. (Id. at 316, 317.)  His urinary incontinence occurred once or twice a month. (Id. at 317.)  He expressed a desire to hurt members of his family. (Id.)  He lived with his father and his two children. (Id.)  He was currently unemployed, but had previously been a cab driver. (Id.)  He did not have any suicidal or homicidal ideation. (Id. at 318.)  It was also noted that he had tested positive in 2007 for the hepatitis C virus, but a 2010 workup was negative for hepatitis. (Id.)  He had normal abdominal x-rays. (Id.)  On examination, he had "vague symptoms and no localizing signs or pain." (Id.) Dr. Voss suspected that Plaintiff's psychological stress was a component

of his abdominal pain.  (Id.)  Plaintiff was continued on the Celexa (the brand name form of citalopram) for his depression and was given the telephone number of a psychiatrist to call. (Id. at 319.)  He was to return in four months.  (Id.)

On September 14, after falling when standing up from a sitting position, Plaintiff went to the emergency room at Barnes Jewish Hospital and was admitted.  (Id. at 360-89.)  After falling, he had attempted to rise, but appeared unsteady and was assisted by a friend.  (Id. at 385.)  He did not appear to have lost consciousness, and was not weak or confused following the fall.  (Id. at 371, 385.)  He was brought to the emergency room and was seen to be bradycardiac, i.e., he had a slow heart rate.  (Id. at 365, 385.)  He reported that he had had intermittent episodes of dizziness and passing out during the past few weeks and that the frequency of the episodes was increasing.  (Id. at 367-68.)  His current medications included Alprazolam for anxiety; citalopram for depression; and Loratadine for seasonal allergies.  (Id. at 381, 386.)  He took Cialis as needed for sexual activity.  (Id. at 386.)  He was single and lived with his father, his brother, his brother's two children, and his own two, teenage children.  (Id.)  He had tested positive for hepatitis C in 2007, but it was unknown if that was a false positive or if the infection had cleared.  (Id.)  He had constipation with intermittent diarrhea, lower back pain, depression, and anxiety.  (Id.)  On examination, his back was not tender and his extremities had full strength and a full range of motion.  (Id. at 387.)  He was pleasant and cooperative, had clear and logical speech, and was goal-oriented.  (Id.)  He also had "[a] depressed mood but relatively euthymic affect."  (Id.)  A CT scan of his head, chest x-rays, and a hepatitis function panel were all normal.  (Id. at 375-77, 388.)  During the

- 12 -

course of his two-day hospitalization, his bradycardia was assessed as being regular and he was considered to be asymptomatic.  (Id.)  He was discharged on September 16 in stable condition with instructions to engage in such activities as tolerable and to follow up with Dr. Melissa Sum at Wohl Clinic the next month.  (Id.)

## The ALJ's Decision

The ALJ first determined that Plaintiff met the insured status requirement of the Act through September 30, 2010, and had not engaged in substantial gainful activity since his alleged disability onset date of September 1, 2006.  (Id. at 14.)  Plaintiff's earnings after that date were insufficient to be substantial gainful activity.[8]  (Id.)  He next found that Plaintiff had severe impairments of hepatitis C.  (Id. at 15.)

Plaintiff's alleged neck impairment was not severe.  (Id.)  Although he had reported on a medical treatment form that he had mid-clavical degenerative disc disease and mild cervical spine degenerative disc disease at the C4-C5 level, the medical records did not include any such test results, including an x-ray of his neck.  (Id.)  Nor were Plaintiff's depression and anxiety severe.  (Id. at 16.)  He did not have any limitations in the functional area of activities of daily living and had only mild limitations in the area of social functioning and in the area of concentration, persistence, or pace.  (Id. at 16-17.)  He did not have any episodes of decompensation.  (Id. at 17.)  The ALJ noted that Plaintiff had not had any mental health treatment other than medication and had not followed up on the referral he had

---

[8]The ALJ noted that there was evidence suggesting that Plaintiff had worked full-time for Tara Transportation.  Because the dates and duration of this employment were unclear and because the ALJ based his unfavorable decision on other grounds, the ALJ declined to resolve the question.

been given to a psychiatrist. (Id.) "[O]ther than an altercation with his nephew and a tendency to neglect dirty dishes," he had not testified about any functional limitations caused by a mental impairment. (Id.)

Next, the ALJ declined to consider the IQ scores reported by Plaintiff's attorney as being indicative of his intellectual functioning. (Id. at 18.) He noted that other, later scores reflected cognitive functioning above the level of mild mental retardation and that Plaintiff's history of semi-skilled work and his activities of daily living were inconsistent with mild mental retardation. (Id.)

The ALJ further found that Plaintiff did not have a medically determinable impairment affecting his left knee. (Id.) He had not been diagnosed with such, nor had he ever complained of any symptoms relating to that knee to a health care provider. (Id.) The only evidence of a left knee problem was Plaintiff's testimony. (Id.) Plaintiff also did not have a medically determinable impairment of fecal incontinence. (Id. at 19.)

Plaintiff's severe impairment of hepatitis C did not satisfy Listing 5.05 nor did his impairment or combination thereof meet or medically equal another listed impairment, including Listing 12.05C. (Id.) Again addressing the question of Plaintiff's IQ scores, the ALJ noted that there (a) was no evidence that the scores cited by Plaintiff's attorney were determined by a psychologist or by another qualified professional and (b) no health care provider ever suspected mental retardation or another impairment in intellectual functioning and, indeed, had stated that he did not appear to be mentally retarded. (Id.) Additionally, although Plaintiff reported that he had difficulty reading, he was "apparently literate, did not

- 14 -

require special education services, and performed semi-skilled work in the private sector for many years." (Id. at 19-20.)  He did not testify about or report any symptoms or limitations caused by impaired intellectual functioning, nor did he allege such when applying for disability.  (Id. at 20.)  He reported that he sometimes needs to be reminded about appointments, but he is able to take care of himself and his two children.  (Id.)  (Id.)

The ALJ determined that Plaintiff had the residual functional capacity to perform light work with the additional restriction of not performing work that required preparation of or direct contact with food.  (Id. at 20.)  When reaching this conclusion, the ALJ evaluated Plaintiff's credibility.  (Id. at 21.)  He found such credibility weakened by (a) the lack of supporting objective medical evidence, including normal hepatic function panels, normal liver function tests, and the lack of any treatment for hepatitis; (b) the lack of any treatment for abdominal pain or for urinary incontinence from 2007 to 2009 and the infrequency of complaints of such after that period; (c) his "inconsistent allegations of unsubstantiated symptoms and limitations," e.g., neck pain and left knee pain and weakness; (d) the inconsistency between his allegations about functional limitations and (i) the lack of complaints of such to a treating or examining physician, (ii) his reports in 2007 and 2008 of good exercise habits, no physical disabilities, and no problems with activities of daily living, and (iii) his denial of any memory problems; (e) his "numerous inconsistent statements," e.g., he testified that he occasionally tried to do household chores, but reported that he did numerous chores without assistance; (f) his "robust activities of daily living"; and (g) his

work after his alleged onset date of disability, including his ability to travel for work.  (Id. at 20-24.)

With his RFC, Plaintiff was capable of performing his past relevant work as a mail clerk as the job was generally performed, i.e., unskilled work with a specific vocation preparation (SVP) rating of two.[9]  (Id. at 25.)  He was not, therefore, disabled within the meaning of the Act.  (Id.)

### Additional Information Before the Appeals Council

Arguing before the Appeals Council that the case should be remanded for solicitation of medical expert testimony on the validity of Plaintiff's IQ scores, Plaintiff's counsel submitted an article about the "Flynn effect."  (Id. at 197-202.)  This article, apparently downloaded from "Gladwell.com," described the findings of James Flynn, a New Zealand social scientist, based on his extensive study of IQ scores reflecting an increase in IQ scores of "three points per decade."  (Id. at 198.)  Studying the Wechlser Intelligence Scale for Children (WISC) in particular, Mr. Flynn determined that the biggest gains were "in the category known as similarities."  (Id. at 199.)  Because the test is regularly "'normed'" so that the test-takers at the median are assigned a score of 100, the assessment of an individual's IQ depends on knowing what version of the WISC he or she took "since there's a substantial difference between getting a 130" on the fourth edition of the WISC than on the first.  (Id.)

---

[9]"The SVP level listed for each occupation in the DOT connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. At SVP level one, an occupation requires only a short demonstration, while level two covers occupations that require more than a short demonstration but not more than one month of vocational preparation.  2 *Dictionary of Occupational Titles* [DOT] app. C at 1009 (4th ed. 1991)." **Hulsey v. Astrue**, 622 F.3d 917, 923 (8th Cir. 2010).

### Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Hurd v. Astrue** , 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.1520(c).  A "severe

- 17 -

impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ

consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines "'whether a claimant's impairments keep [him] from doing past relevant work.'" **Wagner**, 499 F.3d at 853 (quoting Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996)). If "the claimant has the [RFC] to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." **Lowe v. Apfel**, 226 F.3d 969, 973 (8th Cir. 2000). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, however, the ALJ holds at step four of the process that a claimant cannot return to his past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national

economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Moore**, 623 F.3d at 602; **Jones v. Astrue**, 619 F.3d 963, 968 (8th Cir. 2010); **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.  "'If after reviewing the

record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789).  <u>See</u> <u>also</u> **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred by (1) not recognizing that the IQ scores submitted by his attorney establish that he is mildly mentally retarded and that this impairment, combined with his hepatitis C, satisfies Listing 12.05C; (2) not basing his RFC findings on "some" medical evidence, including that of his abdominal difficulties and urinary incontinence; and (3) posing a hypothetical question to the VE that did not include at least borderline intellectual functioning and failing to make an explicit finding as to the mental demands of his past relevant work.

<u>IQ</u>.  The introductory paragraph to Listing 12.05 defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates of supports onset of the impairment before age 22."[10]  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.05.  The required level of severity for Listing 12.05 is met when the requirements of one of four paragraphs are satisfied.  <u>Id</u>.  One of those four, paragraph C, requires "[a] valid

---

[10]The Court notes that the requirements in the introductory paragraph to Listing 12.05 are mandatory.  **Maresh v. Barnhart**, 438 F.3d 897, 899 (8th Cir. 2006).

verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id. "The additional limitation need not be disabling, but it must have a 'more than slight or minimal effect on [the claimant's] ability to perform work.'" **McNamara v. Astrue**, 590 F.3d 607, 611 (8th Cir. 2010) (quoting Sird v. Chater, 105 F.3d 401, 403 (8th Cir. 1997)).  As with any other listing, the burden is on the claimant to prove that his impairment meets all of Listing 12.05C's criteria.  See **Carlson v. Astrue**, 604 F.3d 589, 593 (8th Cir. 2010).

Plaintiff contends that his May 1975 verbal IQ score of 69 satisfies the first requirement of Listing 12.05C.[11]  As noted above, Plaintiff would have been nine years old at the time.  Although "'[a] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning,'" **Phillips**, 721 F.3d at 626 (quoting Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001)) (alteration in original),[12] the regulations provide that IQ test scores of forty or above are valid for only two years when the results were obtained between ages seven and sixteen, 20 C.F.R. Part 404, Subpt. P, Appx. 1, § 112.00(D)(10).  Thus, the IQ scores obtained when Plaintiff was nine are not valid.

---

[11]The requirement of an additional limitation does not appear to be in dispute.  It is irrelevant, however, if the first requirement is not met.  See **Phillips v. Colvin**, 721 F.3d 623, 629 n.4 (8th Cir. 2013).

[12]In Phillips, the court rejected the claimant's argument that the district court was precluded finding that there had been a change in his intellectual functioning.  **Phillips**, 721 F.3d at 626-27.  Distinguishing Phillips' case from that of Muncy's, the court noted that the twenty-five point IQ discrepancy in Muncy was at least twice that of the discrepancy in Phillips.  **Id.** at 627.  Moreover, the ALJ in Phillips had addressed the discrepancy in IQ scores, whereas the ALJ in Muncy had not.  **Id.**  Supporting the ALJ's conclusion in Phillips that the more recent IQ score was more accurate was his finding that the latter was more consistent with Phillips' daily activities.  **Id.**

Even if they were, an ALJ "'is not required to accept a claimant's IQ scores . . . and may reject scores that are inconsistent with the record.'"  **Miles v. Barnhart**, 374 F.3d 694, 699 (8th Cir. 2004) (quoting Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1988)) (alteration in original).  "'Indeed, test scores of this sort should be examined to assure consistency with daily activities and behavior.'"  **Id.** (quoting Clark, 141 F.3d at 1255).

The ALJ did examine Plaintiff's IQ scores and found them to be inconsistent with the record.  For instance, Plaintiff's medical records do not include any indication that he was thought to be mentally impaired.  See **Clark**, 141 F.3d at 1256 ("find[ing] it significant in gauging the reliability of [the claimant's] current IQ scores" that nothing in her medical records indicated that she was ever suspected of being mildly mentally retarded prior to her low IQ scores on exam by non-treating psychologist).  Indeed, when noting that Plaintiff was a poor historian, Dr. Martinez stated that he did *not* appear to be mentally retarded.

It was, as noted by the ALJ, also relevant that Plaintiff had not claimed mental retardation, or even borderline intellectual functioning, as an impairment when applying for SSI.  See **Clay v. Barnhart**, 417 F.3d 922, 929 (8th Cir. 2005) (holding that ALJ's finding that claimant did not satisfy Listing 12.05C criteria was supported by, among other things, her failure to initially claim mental retardation and the lack of treatment or diagnosis for such).  When applying for disability, Plaintiff cited hepatitis C and stomach problems; when appealing the initial denial, he added a nervous condition to his previously-alleged impairments; when seeing Dr. Martinez, he told her he was applying for disability due to abdominal pain; when testifying, he cited hepatitis C, arthritis in his neck and left knee, and

depression as his disabling impairments.  He never cited, nor referred to, impaired intellectual functioning.

Nor has Plaintiff ever been terminated from a job because of a lack of intellectual ability.  See **Miles**, 374 F.3d at 699 (holding that ALJ's finding that claimant did not satisfy Listing 12.05C criteria was supported by, among other things, evidence that she had never been terminated from a job due to lack of mental ability).  Additionally, Plaintiff was able to shop on the computer, obtain a driver's license, care for his two children, count change, and pay bills.  See **Clark**, 141 F.3d at 1256 (holding that ALJ's finding that claimant did not satisfy Listing 12.05C criteria was supported by, among other things, her ability to read, write, count money, and obtain a driver's license).  Although he left school after the eighth grade and had "Fs" in three years, he was not in special education classes and did not attribute his departure or his grades to any intellectual difficulties.

Additionally, as noted by the ALJ, there is no indication of who had administered the IQ test cited by Plaintiff's attorney.  Cf. **Id.** (finding that IQ scores based on test administered by non-treating psychologist were not entitled to controlling weight).

Plaintiff further argues that his case should be remanded for medical expert opinion based on the "Flynn effect."  Regardless of the applicability of this effect on Plaintiff's IQ scores – certainly an open question at least – the ALJ's decision not to give those scores the weight Plaintiff advocates is supported by substantial evidence on the record as a whole.  See **Hines v. Astrue**, 317 Fed.Appx. 576, 579 (8th Cir. 2009) (per curiam) (ALJ properly considered lack of any mental health treatment for cognitive deficits and that IQ full scale

score of 67 stood alone as quantitative evidence of mental retardation when concluding that claimant did not satisfy Listing 12.05C); **Miles**, 374 F.3d at 699 (ALJ did not err in discrediting claimant's IQ score of 59 when he had, inter alia, completed a vocational training program and had never been terminated from a job for lack of mental ability); **Howard v. Massanari**, 255 F.3d 577, 582-83 (8th Cir. 2001) (rejecting an argument that a claimant with an IQ score of 71 "should be allowed the benefit of the mental retardation categorization" when the record did not include any other IQ testing and there was no other evidence supporting the claimed restrictions in intellectual functioning); **Roberts v. Apfel**, 222 F.3d 466, 469 (8th Cir. 2000) (rejecting argument that claimant was unable to work due to a learning disability when claimant had successfully held employment for years "with the cognitive abilities he currently possesses).

RFC.  Plaintiff next argues that the ALJ's finding that he has the residual functional capacity for light work is not supported by even "some" medical evidence and his abdominal pain, urinary incontinence, and low IQ impose additional limitations.  "According to the regulations, 'light work' is generally characterized as (1) lifting or carrying ten pounds frequently; (2) lifting twenty pounds occasionally; (3) standing or walking, off and on, for six hours during an eight-hour workday; (4) intermittent sitting; and (5) using hands and arms for grasping, holding, and turning objects." **Holley v. Massanari**, 253 F.3d 1088, 1091 (8th Cir. 2001) (citing 20 C.F.R. § 404.1567(b) and Social Security Ruling 83–10, 1983 WL 31251, at *4–5 (S.S.A. 1983)).

As noted above, "[t]he RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting Social Security Ruling 96-8p, 1996 WL 374184, at *3 (S.S.A. 1996)); accord **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003).  "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." **Roberson**, 481 F.3d at 1023.  See also Social Security Ruling 96-8p, 1996 WL 374184 at *5 (listing factors to be considered when assessing a claimant's RFC, including, among other things, medical history, medical signs and laboratory findings, effects of treatment, medical source statements, recorded observations, and "effects of symptoms . . . that are reasonably attributed to a medically determinable impairment").  An ALJ does not, however, fail in his duty to assess a claimant's RFC on a function-by-function basis merely because the ALJ does not address all areas regardless of whether a limitation is found.  See **Depover**, 349 F.3d at 567.  Instead, an ALJ who specifically addresses the areas in which he found a limitation but is silent as to those areas in which no limitation is found is believed to have implicitly found no limitation in the latter.  **Id.** at 567-68.  See also **Craig v. Apfel**, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.").

In support of his argument that the ALJ's RFC findings are not based on some medical evidence, Plaintiff cites his abdominal pain, urinary incontinence, and low IQ.

There is no support in the record that any of these three conditions limit his RFC beyond the restrictions included by the ALJ.  Regardless of his complaints of abdominal pain, Plaintiff's abdomen was routinely not tender or swollen.  X-rays were normal, and a CT scan was not considered not necessary because there was no distension or hepatosplenomegaly.  Moreover, there is no evidence that Plaintiff sought psychological care after Dr. Voss opined that his abdominal pain had a psychological component.[13]  See **Comstock v. Chater**, 91 F.3d 1143, 1147 (8th Cir. 1996) (finding that "ALJ was entitled to discount [claimant's] complaints based on his failure to pursue medical treatment").

One year after his alleged disability onset date, an examination by Dr. Hendricks showed no genitourinary or psychological symptoms.  A urinary analysis performed three and one-half years after his alleged disability onset date was negative.  Plaintiff informed Dr. Voss when he saw him one month shy of four years after his alleged disability onset date that he had urinary incontinence once or twice a month.

Plaintiff refers in his supporting brief to his long history of abdominal difficulties. (Pl.'s Br. at 11, ECF No. 17.)  In the medical records, he describes that history as reaching back at least twenty years.  It is undisputed, however, that Plaintiff worked during those twenty years.  Indeed, Plaintiff worked after his alleged disability onset date.  See **Gowell v.**

---

[13]The Court notes that Plaintiff testified he was scheduled to see a psychologist for his depression.  Although school records were submitted to the ALJ after the hearing and the article about the "Flynn effect" was submitted to the Appeals Council, no records of a psychologist were ever submitted.  And, at the time of the hearing, Plaintiff had been approved for Medicaid.

**Apfel**, 242 F.3d 793, 798 (8th Cir. 2001) (finding it relevant to disability determination that claimant was able to work "for years with her impairments").  There is evidence that he left one of those jobs because it was seasonal and left another because it was part-time and he wanted full-time work.  See **Medhaug v. Astrue**, 578 F.3d 805, 816-17 (8th Cir. 2009) (finding it relevant to disability determination that claimant left work for reasons unrelated to alleged impairment); accord **Goff**, 421 F.3d at 792-93.

"[I]n evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively."  **Cox v. Astrue**, 495 F.3d 614, 619 (8th Cir. 2007).  The ALJ's determination of Plaintiff's RFC was properly based on all the relevant evidence.  Plaintiff's argument to the contrary is without merit.

Hypothetical Question.  As noted by Plaintiff, a hypothetical question to a VE should include all the concrete consequences of the claimant's impairments, see **Renstrom v. Astrue**, 680 F.3d 1057, 1067 (8th Cir. 2012); **Jones**, 619 F.3d at 972; however, that question "needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole,'" **Renstrom**, 680 F.3d at 1067 (quoting Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011)).  The question need not incorporate additional limitations properly disregarded by the ALJ.  **Id.**  Such limitations may include those based on a claimant's discounted subjective complaints and those based on medical opinions that the ALJ has given less weight to than to others.  **Id.**  Accord **Perkins v. Astrue**, 648 F.3d 892, 902 (8th Cir. 2011); **Heino v. Astrue**, 578 F.3d 873, 882 (8th Cir. 2009).

In the instant case, the ALJ posed a hypothetical question to the VE that encompassed the concrete consequences of the impairments he found to be supported by substantial evidence on the record as a whole.  Because, as discussed above, that finding, including the lack of absence of any impaired intellectual functioning, is supported by substantial evidence on the record as a whole, the hypothetical question was proper.

Plaintiff further argues that the ALJ erred by not making explicit findings as to the mental demands of his past relevant work.  This argument is without merit.

The ALJ found that Plaintiff could return to his past relevant work as a mail clerk. That job, DOT 209.687-026, as a SVP of 2, i.e., "[a]nything beyond short demonstration up to and including 1 month."  DOT, 1991 WL 671813 (G.P.O. 1991).  This SVP level is considered unskilled work.  Social Security Ruling 00-04p, 2000 WL 1898704,*3 (S.S.A. Dec. 4, 2000).

In **Young v. Astrue**, 702 F.3d 489 (8th Cir. 2013), the Eighth Circuit Court of Appeals rejected a claimant's argument that the ALJ failed to make explicit findings about the demands of her past relevant work, holding that "'[t]he ALJ may discharge this duty by referring to the specific job descriptions in the [DOT] that are associated with the claimant's past work.'"  **Id.** at 491 (quoting Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999)).  Having expressly referred to the DOT and to the work as being unskilled, as did the ALJ in the instant case, the ALJ was found to have adequately discharged his duty.  **Id.** at 491-92.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010).  Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  20th  day of September, 2013.